UNITED STATES OF AMERICA

v.

NECKES DANBREVILLE,

    Defendant.
_____/

# ORDER

THIS CAUSE comes before the Court on Defendant's Motion to Suppress Evidence (D.E. 14) (the "Motion").

The Court has considered the Motion, the pertinent portions of the record, and is otherwise fully advised in the premises.

This matter was referred to Chief Magistrate Judge John J. O'Sullivan, who, on January 31, 2020, following an evidentiary hearing, issued a report (the "Report") (D.E. 34) recommending that the Motion be DENIED because officers had reasonable suspicion to stop and frisk the Defendant when an anonymous tipster reported to the Miami-Dade Crime Stoppers Unit that he or she observed a black male wearing a teal shirt and cargo shorts brandish a firearm and threaten an unidentified victim outside a U-Save Supermarket and then saw the suspect at a bus stop approximately three blocks away at Northwest 79th Street and 17th Avenue. Officers stopped the Defendant, a black male wearing a teal shirt and cargo shorts at a bus stop at Northwest 79th Street and 17th Avenue, and found a firearm and ammunition on his person.

    **I.**     **Defendant's Objections (D.E. 37)**

Both parties filed objections to the Report. D.E. 37; D.E. 38. Defendant, in his Objections, requests that as part of this Court's *de novo* review, this matter be set for an additional hearing on the Motion to Suppress. D.E. 37 at 1. Defendant makes the following seven factual objections.

1. First, Defendant objects to the Report's "omission of the fact that any alleged victim of an aggravated assault with a firearm was never located or identified by law enforcement," and omission of the fact that "no efforts were made by law enforcement to locate or identify the alleged victim." D.E. 37 at 1–2. The Report states: "Detective Rivas told Supervisor Chresfield that Detective Rivas believed the victim was still on scene 'because there[ was] a tipster calling in that this guy has a gun and waved it at somebody.'" D.E. 34 at 3 (citing Gov. Ex. 8). The Report further notes that "the tipster did not describe the victim." *Id.* at 4. The objection is overruled; the Court is satisfied that the officers had reasonable suspicion to conduct the stop and frisk and any additional information about the victim is not necessary to resolve whether the officers had reasonable suspicion.

2. Second, Defendant objects to the Report's "omission of the testimony related to the definition of a '55 in progress.'" D.E. 37 at 2. Defendant points to the testimony of Detective Rivas, who testified that a "55" is code for a weapons violation, and of Supervisor Chresfield, who testified that "in progress" means "that a crime is happening now but there is no threat to human life." *Id.* The objection is overruled. The Court is satisfied with the Report's explanation that when Detective Rivas called Supervisor Chresfield about "a '55'[,] police code for a weapons violation," Chresfield responded "that would be a 32 [because] he threatened someone." D.E. 34 at 3.[1]

---

[1] Detective Rivas testified to the following:
> Q. And is your recollection that the tipster told you that there was a threat that was made by the individual who was the subject of the tip?
> A. Yes.
> Q. And that during that threat the individual was brandishing a firearm?
> A. Yes.

3. Third, Defendant objects to the following in the Report: "from the tipster's tone of voice, the way the tipster was speaking conveyed to Detective Rivas that there was some type of urgency." D.E. 34 at 4. Defendant further argues that "evidence established during the evidentiary hearing strongly contradicted the finding of urgency," including that the call was initially a "55 in progress," that Detective Rivas did not know whether the victim was still in danger, that there were no attempts to locate the victim. D.E. 37 at 3. However, during the hearing, Detective Rivas testified that "the tipster basically said that there was some type of urgency . . . the way the tipster was speaking, you know, the tone. Voice and everything else basically stated there was some type of emergency at that point." Tr. at 24:10–16. Further, Detective Rivas testified that Northwest 79th Street and 17th Avenue is a "high crime area" based on the "amount of calls and the type of calls we get in that area," and that the area can be particularly dangerous at night, when the tip was received. *Id.* at 18:13, 33:4–12. Officer Trujillo testified that the "in that specific market we have had anywhere from shootings, I believe stabbings, car accidents, drug activity." *Id.* at 57:7–8. The objection is overruled.

4. Fourth, Defendant objects to the Report's "reliance on the fact that 'the dispatch relayed that there was a '232' [an assault in progress] at the bus stop at 17th Avenue and Northwest 79th Street,'" because "there was never any evidence introduced of an assault in progress occurring at the bus stop." D.E. 37 at 3 (quoting D.E. 34 at 5). The tipster relayed that there had been an assault at the U-Save market, approximately three blocks away, and that the suspect was sitting at a bus stop. Tr. at 36:11–25. Defendant again attacks the Report's finding that the evidence established

---

Q. Is that why you agreed with the operator with respect to the call being a 32?
A. Yes.
Q. Was your note about the 55 simply to convey the fact that the firearm -- that the offense involved a firearm?
A. Yes.

Tr. at 15:3–15.

3

an urgent situation. The objection is overruled. The Court is satisfied with Detective Rivas's characterization of the tip as urgent. Moreover, although there was no evidence that the assault was presently occurring at the bus stop, the Eleventh Circuit has noted that when confronted with an emergency situation, "the police must act quickly, based on hurried and incomplete information. Their actions, therefore, should be evaluated by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences." *United States v. Holloway*, 290 F.3d 1331, 1339 (11th Cir. 2002) (citation omitted). The fact that dispatch relayed a "232" instead of a "32" reflects that the police acted quickly in response to what they perceived to be an urgent situation involving a suspect brandishing a firearm and threatening someone with it.[2]

5. Fifth, Defendant objects to the lack of law enforcement's corroboration concerning the portion of the tip about making a threat with or waving a gun: "Officer Trujillo testified that he did not observe anyone waiving a gun or making threats with a gun, and did not see a gun in plain view." D.E. 37 at 4. Officer Trujillo corroborated the other portion of the tip when he testified that upon arriving at the bus stop, "the only individual there as a black male wearing a teal-colored shirt." Tr. at 51:14–15. Here, Office Trujillo encountered Defendant at nighttime in a high-crime area, had reason to believe that criminal activity was afoot given the allegation of brandishing and threatening, and because the Defendant was sitting at the bus stop on NW 79th Street and 17th Avenue and wearing distinctive clothing consistent with the tipster's description was able to partially corroborate the tip. *Navarette v. California*, 572 U.S. 393, 397 (2014) (holding that the contemporaneity of the tip combined with a sufficient description of the illegal conduct—apparent drunk-driving and running the tipster off the road—that the tipster observed through firsthand

---

[2] It was also reasonable for dispatch to believe that the urgent situation was ongoing given the proximity of the U-Save to the bus stop.

4

knowledge created reasonable suspicion); *United States v. Lewis*, 674 F.3d 1298, 1309 (11th Cir. 2012) (characterizing the fact that "the detention took place at night in a high crime area" as "another relevant consideration in the *Terry* calculus"). These circumstances gave rise to reasonable suspicion for an investigatory stop and the objection is overruled. *See infra* ¶ 8 (overruling Defendant's first legal objection).

6. Sixth, Defendant objects to the Report's omission of certain facts from the testimony of Officer Trujillo about Officer Trujillo not observing: a weapon in plain view, Defendant committing a crime, or any victims or witnesses in the area of the bus stop. D.E. 37 at 4. The Report adequately addresses reasonable suspicion and the objection is overruled.

7. Seventh, Defendant "objects to the omission of the fact that, while there is a 'shot spotter' alert system in the Northside District, no evidence presented at the hearing demonstrate[d] that any shots were detected on the evening of September 10, 2019, at the bus stop to which Officer Trujillo responded." D.E. 37 at 5. The objection is overruled; nobody alleged that Defendant fired a shot.

8. Defendant also makes three legal objections. First, Defendant objects to the Report's recommendation that the instant case is distinguishable from *Florida v. J.L.*, 529 U.S. 266 (2000). D.E. 37 at 3. The Court acknowledges that the instant matter is factually similar to *J.L.*, where the Supreme Court held that officers did not have reasonable suspicion to stop and frisk the defendant when the anonymous tip provided that a black male wearing a plaid shirt was carrying a gun at a particular bus stop. However, the distinguishing fact in this case is that the anonymous tip relayed illegal activity—that the Defendant was brandishing his firearm and making threats. *J.L.*, 529 U.S. at 272 ("[R]easonable suspicion . . . requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person."). Here, Detective Rivas told Supervisor

Chresfield that a suspect "came out of a . . . U-Save Supermarket and . . . brandished [a handgun] to someone, and made a threat" and that the "tipster calling in [said] that this guy has a gun and wa[i]ved it at somebody." Gov. Ex. 1 D.E. 29-1 at 9. Unlike *J.L.*, where "[a]ll the police had to go on . . . was the bare report of an unknown, unaccountable informant who [did not] explain[] how he knew about the gun," here, the tipster did explain how he knew about the gun: he saw the suspect brandish it and make threats. *J.L.*, 529 U.S. at 271. Defendant argues that the anonymous tip was not sufficiently corroborated because officers did not observe Defendant brandish his firearm. D.E. 37 at 6–7. However, the Report properly concludes that a tip of a crime committed at night in a high-crime area, with the tipster conveying a sense of urgency and the presence of the Defendant sitting at the bus stop in the clothing described by the tipster, sufficiently provided officers with reasonable suspicion. Moreover, "law enforcement officers may seize a suspect for a brief, investigatory . . . stop where (1) the officers have a reasonable suspicion that the suspect was involved in, or is about to be involved in, criminal activity, and (2) the stop was reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011). The objection is overruled.

9. Second, Defendant objects to the Report's finding that the instant case is more akin to *Navarette v. California*, 572 U.S. 393 (2014) than it is to *J.L.* D.E. 37 at 9. The Report adequately addresses this objection. D.E. 34 at 8–9. The objection is overruled.

10. Third, Defendant argues that the Report errs in finding that the tip conveyed an urgency or emergency. D.E. 37 at 11. Defendant contends that there are no facts to support that this was an emergency situation. *Id.* But the fact is that police received a tip that a gunman was brandishing his weapon and making threats in a high-crime area. Detective Rivas testified:

> Q. Based on everything the tipster told you, did you believe that this was an emergency situation?

> . . .
> A. Yes.
> Q. Why?
> A. Preserve life.
> Q. Can you elaborate on that a little bit?
> A. Yes. If someone has a gun and is making threats and is brandishing, that is deemed an emergency, and that's why I made the phone call to the shift commander.
> Q. Was it because of the possibility of an imminent shooting?
> A. Yes.
> . . .
> Q. Is every tip that you receive at Crime Stoppers something that you immediately forward on to MDPD Dispatch?
> A. No.
> Q. Why not?
> A. Because if it's not deemed an emergency it's not -- we don't have to contact the shift commander.
> Q. Do you have the discretion to make that decision as to whether something that comes in is an emergency or not?
> A. Yes.

Tr. at 16:23–18:24. Detective Rivas also testified that "the tipster basically said that there was some type of urgency . . . the way the tipster was speaking, you know, the tone. Voice and everything else basically stated there was some type of emergency at that point." *Id.* at 24:10–16. Magistrate Judge O'Sullivan credited Detective Rivas's testimony and found that the frisk was reasonable in part because this case involved a possible threat to human life. The Court agrees. The objection is overruled.

## II. The Government's Objection (D.E. 38)

The Government "agrees in full with the Magistrate Judge's findings of fact, analysis, and recommendation," but objects to the Report not "address[ing] an additional argument the government raised in response to Defendant's suppression motion: that officers acted in good faith, precluding suppression." D.E. 38 at 1–2; *see also* D.E. 18 at 13–14.

The exclusionary rule serves as "a deterrent sanction that bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." *Davis v. United States*,

564 U.S. 229, 231–32 (2011). The "application of the good-faith exception [is limited] to situations where its 'precedent on a given point [is] unequivocal.'" *Id.* at 251 (Sotomayor, J., concurring) (citation omitted). "Police practices trigger . . . exclusion only when they are deliberate enough to yield meaningful deterrence, and culpable enough to be worth the price paid by the justice system." *United States v. Taylor*, 935 F.3d 1279, 1289 (11th Cir. 2019).

The Government's argument that the good faith exception should apply to the *Terry* stop here is too broad. First, the cases the Government cites concern exceptions to the warrant requirement, not *Terry* stop reasonable suspicion. *United States v. Babcock*, 924 F.3d 1180, 1187 (11th Cir. 2019) (noting that "[i]n *Terry v. Ohio*, the Supreme Court famously held that, even absent probable cause, police officers may briefly detain an individual based on reasonable suspicion that he is (or is about to be) engaged in criminal activity"). Indeed, the good faith exception is characterized as being one of "good faith reliance on a *search warrant*." *United States v. Leon*, 468 U.S. 897, 904 (1984) (emphasis added); *see also Davis v. United States*, 564 U.S. 229 (2011) (holding that the officers' then-lawful search incident to arrest of defendant's vehicle was constitutional even though binding precedent issued during defendant's appeal held that it was not, because at the time of the arrest, the police acted with an objectively reasonable good-faith belief that their conduct was lawful).[3] Second, while the Government argues that the exigency here was sufficient to justify the frisk, the Government fails to cite to a single case suggesting that an officer's good faith could justify an "exigent" *Terry* stop.[4] D.E. 18 at 10. Instead, the Government

---

[3] Moreover, the Supreme Court has cautioned against modifying the reasonable suspicion reliability analysis. *Florida v. J.L.*, 529 U.S. 266, 572 (2000) (refusing to modify the *Terry* standard to include an automatic "firearm exception" since it "would rove too far" from established reliability precedent).

[4] The Court is aware of one binding case concerning both a *Terry* stop and the good faith exception. In *United States v. Meko*, 912 F.3d 1340 (11th Cir. 2019), the Eleventh Circuit held that an officer had reasonable suspicion to stop a motorist for a traffic violation, and while the officer did unlawfully prolong

conflates the exigent circumstances exception to the warrant requirement with the good faith exception.[5] The Court has taken into account the urgency of the situation in evaluating reasonable suspicion. *Supra* ¶¶ 3, 8, 10. The Court will not hold that the urgency created a good faith exception to justify the *Terry* stop in this case.

Upon *de novo* review of the Motion, Report, Objections, and responses to the Objections, the undersigned agrees with Magistrate Judge O'Sullivan's recommendation in all respects, with the addition that the good faith exception provides an additional basis for relief. Accordingly, it is hereby

ORDERED AND ADJUDGED that the Motion, D.E. 14, is DENIED. It is further

ORDERED AND ADJUDGED that the Report, D.E. 34, is ADOPTED, RATIFIED, AND AFFIRMED in all respects. It is further

ORDERED AND ADJUDGED that the Objections, D.E. 37 and D.E. 38, are OVERRULED.

DONE AND ORDERED in Chambers at Miami, Florida, this _12th__ day of February, 2020.

_____
URSULA UNGARO
UNITED STATES DISTRICT JUDGE

---

the stop when he asked unrelated questions, the good faith exception applied because those questions were permitted under binding precedent at the time of the stop.

[5] The Government argues that *United States v. Holloway*, 290 F.3d 1331 (11th Cir. 2002), an exigent circumstances case, provided an unambiguous basis for the officers' actions. D.E. 18 at 14. In *Holloway*, the Eleventh Circuit held that the exigent circumstances exception to the warrant requirement applied when a 911 call reported gunshots and arguing originating from the defendant's home, prompting officers to respond quickly, search the home, and recover a firearm. 290 F.3d at 1332, 1341. The Government also cites to *United States v. Taylor*, 935 F.3d 1279, 1289 (11th Cir. 2019), in which the Eleventh Circuit held that the officer reasonably relied on a defective warrant.

copies provided:

Counsel of record via CM/ECF